UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JENNIFER CARUSO,

     *Plaintiff*,

v.                              **Case No. 5:23-CV-1422-JKP**

HILL COUNTRY MENTAL HEALTH
& DEVELOPMENT DISABILITIES
CENTERS,

     *Defendant*.

## MEMORANDUM OPINION AND ORDER

      Before the Court is a Motion for Summary Judgment (ECF No. 19) filed by Defendant Hill Country Mental Health & Developmental Disabilities Centers ("Defendant," "Hill Country," or "HC"). Pursuant to Fed. R. Civ. P. 56, Defendant seeks summary judgment on Plaintiff's claims asserted in her Second Amended Complaint ("SAC")[1] (ECF No. 9) under the Americans with Disabilities Act ("ADA") for discrimination, failure to accommodate, and retaliation. With Plaintiff's response (ECF No. 21) and Defendant's reply brief (ECF No. 23) the summary judgment motion is ripe for ruling. After considering the motion, related briefing, relevant pleadings, submitted evidence,[2] and applicable law, the Court grants the motion.

---

[1] The Court recognizes that Plaintiff filed a Second Amended Petition. But in federal court, the pleading is properly referred to as a complaint.

[2] Both sides have submitted evidence with their briefing. With its motion, Defendant provides an appendix (ECF No. 19-1) containing three deposition transcripts (Exs. A, B, and C), a business records declaration (Ex. D) with several attached documents (Ex. D-1 through D-18), and two audio file transcripts (Exs. E and F). As this evidence is submitted as a single electronic attachment to the motion, the Court will refer to the transcripts by name, page, and lines, while referring to the other exhibits as Ex. D-1, etc., with citation to the page number provided by the Court's electronic case filing system. Plaintiff does not even submit its evidence as a separate electronic attachment—instead filing a 310-page document, which includes her response and all attachments, the same three deposition transcripts, followed by other documents starting at page 298. To the extent Plaintiff provides and cites to evidence different from the Defendant's submissions, the Court will cite to such evidence with the page number provided by the electronic case filing system.

# I. BACKGROUND[3]

This case concerns Plaintiff's employment with Defendant from her hiring on July 2, 2019, through her termination on September 30, 2021. The basic timeline of events is consistent and undisputed. Several individuals from Hill Country are relevant to this case, including Plaintiff, Ross Robinson (Executive Director at time of hiring), Landon Sturdivant (Executive Director at time of termination), David Fouse (Director of HR and Staff Development), Analaura McCrae (Plaintiff's direct supervisor), Regional Directors Carmen Martinez and Laura McElligott, and Debbie Littlesmith. In general, the Court will refer to each of these individuals by their surname. At times the Court will refer to Fouse and Sturdivant, collectively and individually, as management given their positions at HC.

## A. Plaintiff's Hiring and Early Employment (July 2019 through May 2021)

Defendant hired Plaintiff as its Director of Specialized Services on July 2, 2019. She was one of three individuals who reported directly to McCrae—the other two being Regional Directors Martinez and McElligott (after she replaced another individual). There are some disputes as to the exact parameters of her interview. For instance, McCrae states that she and Martinez interviewed Plaintiff at a Hill Country office, McCrae Dep. 9:1-16; Ex. D-13 at 211, whereas Plaintiff recalls the interview being at a restaurant with other employees, including McCrae and Littlesmith, *see* Pl.'s Dep. 15:3-13. Plaintiff did not recall whether Robinson was at the interview or whether she ever interviewed at Hill Country. *Id.* 15:14-21. Martinez confirmed that she participated at the interview. Ex. D-13 at 211. She recalled that Plaintiff "was wondering if she could have the one day off a week," and McCrae agreed "that was workable." *Id.* No one disputes that Plaintiff's "Original Schedule" permitted her to work a four-day, ten-hour per day work week, with

---

[3] The factual background is uncontested unless otherwise noted. The Court considers disputed facts in the light most favorable to the non-movant as required through the summary judgment process.

Wednesdays off.

Plaintiff testified that Robinson and Littlesmith recruited her to join them at Hill Country. Pl.'s Dep. 10:15-11:4. She had worked closely with Littlesmith as a trainer. *Id*. 11:2-3. Plaintiff testified that, prior to her interview, all parties were aware of her medical conditions. *Id*. 15:25-16:1. At the interview, they discussed her medical condition, its effect on her vocal cords and energy, and a work schedule "due to [her] medical conditions." *Id*. 16:9-12. But she conceded that she did not "remember [her] words at the interview." *Id*. 16:17-19. Nevertheless, she stated that she was "unable to work five days a week." *Id*. 16:20-21. She stated that it was difficult to work five consecutive days because of her vocal cords and fatigue, she required Wednesdays off to rest, she had that schedule with her prior employer, and would only be able to accept a position with Hill Country if she had the same schedule. *Id*. 16:23-17:8. She testified that she also told Robinson that she could not work five consecutive days because of her medical condition. *Id*. 18:6-19:9.

Despite these stated impairments, no "healthcare provider ever provide[d] documentation to support [her] request for" Wednesdays off due to fatigue or vocal rest. *Id*. 102:9-16. And, after she commenced work at HC, she never told anyone there that she "needed an ADA accommodation because of the physical impairments [she] described affected [her] ability to perform the essential functions of [her] job." *Id*. 102:17-23. She did not tell anyone about her need for accommodation after she commenced work, because the "accommodations were already in place." *Id*. 102:24-103:5.

According to McCrae, she did not learn of Plaintiff's medical history until "about three months after she was hired," when she shared information about her cancer diagnosis and some of her treatment. McCrae Dep. 14:7-15:14. She testified that, prior to Plaintiff accepting the position she expressed a preference for working such schedule because it "had been her schedule at her previous employer." *Id*. 16:21-17:4. At that time, McCrae saw no issue with that schedule even

though she did not know why she had the schedule with the prior employer. *Id*. 17:6-17. Other than requesting more pay, Plaintiff made no other request prior to being hired. *Id*. 17:18-25. Before approving the requested schedule, McCrae spoke with Robinson, who basically viewed it as acceptable, "as long [as] it works, it works, as long as we can get the work done." *Id*. 18:3-9.

Plaintiff worked that schedule at Defendant's offices until March 2020, when she began working from home due to the COVID-19 pandemic. *Id*. 26:4-27:6; Pl.'s Dep. 151:20-22. In a later email (August 29, 2021) to management, Plaintiff described a positive work experience through May 2021, while explaining that she schedules all appointments for her, her mother, and her five children on Wednesdays "to minimize any impact on [her] work availability." *See* Ex. D-2 at 167. She stated that before she received the offer for employment with Defendant, McCrae knew she was a cancer survivor who "deals with ongoing, permanent side effects because the cancer damaged [her] vocal cords and metastasized into [her] lymph nodes." *Id*. She explained that her cancer "permanently compromised [her] immune system, leaving [her] especially susceptible to viruses and upper respiratory infections." *Id*. She also stated that McCrae knew that she had an anxiety disorder. *Id*. The disorder makes it difficult for her to tolerate wearing a mask. *Id*.

## B. State Audit Preparation (June 2021)

In the email to management, Plaintiff identified a "heated conversation" and a second "passionate conversation" with McCrae that occurred during preparation for a state audit in June 2021. Ex. D-2 at 168. From Plaintiff's view, these matters "remained tense for the remainder of the day and this seems to be where [her] working relationship with [McCrae] changed abruptly for the worse." *Id*. Neither of these conversations related to any disability—they simply addressed differences of opinion regarding support for "a fellow Hill Country leader" and proposed pay increases for Plaintiff's staff. *See id*. According to Plaintiff: "After this day, things were increasingly strained between us. [McCrae] became less responsive to me and stopped interacting with me for the most

part." *Id*.

According to McCrae, she discovered performance issues related to Plaintiff while prepar-
ing for this annual audit.[4] McCrae Dep. 21:21-22:9. During the two-week, audit preparation,
McCrae identified "several issues" that ultimately fell to Plaintiff's responsibility as the supervisor
of her staff. *Id*. 22:2-4. When presented to her, Plaintiff "was not responsive" to suggestions for
improvement. *Id*. 22:4-8. McCrae viewed both the underlying issues with staff, as well as Plain-
tiff's own non-responsiveness as examples of performance issues. *Id*. 22:2-9. Rather than "assum-
ing responsibility for th[e] direct supervision" of employees under her "and assuming responsibil-
ity for needing to make a correction to those issues and committing to improving our system and
improving our processes," Plaintiff was instead "very defensive." *Id*. 22:12-23.

McCrae explained that she and Plaintiff had had "several conversations . . . about our need
to make some system improvements and corrections with staff when [Plaintiff] also proposed or
made a comment about her habilitation coordinators deserving raises." *Id*. 23:18-22. During this
passionate conversation with Plaintiff regarding a requested pay raise for staff, Plaintiff expressed
a lot of disagreement when McCrae stated that she (McCrae) would not ask for a pay increase for
employees who were identified as "not meeting performance targets." *Id*. 23:18-24:4. And, ac-
cording to McCrae, Plaintiff's defensiveness did not improve after the audit. *Id*. 23:9-11.

## C. July and August 2021

Following the state audit, McCrae met with Plaintiff on July 9, 2021, to share her concerns
about performance issues. *See* Ex. D-3 at 171. She shared concerns about matters over which
Plaintiff was merely responsible as a supervisor (unfinished tasks, scheduling issues, performance
of PASRR team) and matters directly attributed to Plaintiff (inadequate supervision and her

---

[4] Defendant states that it did not undergo such a full-blown audit in 2020 due to the COVID-19 pandemic, but its
citation to the record does not support the statement. Nevertheless, Plaintiff does not contest that fact, and the Court
may take judicial notice that COVID-19 disrupted many employment matters during the summer of 2020.

responses to concerns).[5] *Id.*

On July 13, 2021, Plaintiff informed McCrae of her "mother's deteriorating condition, her hospice designation and [her] intention to seek" protection under the Family Medical Leave Act ("FMLA"). Ex. D-2 at 168. That same day, Defendant provided Plaintiff with paperwork for requesting FMLA leave, *see* Ex. D-5 at 175, and Plaintiff forwarded completed paperwork to the doctor's office, Ex. D-2 at 168.

On July 29, 2021, after obtaining information from the hospice doctor, Plaintiff asked about the next steps for the FMLA request. *See* Ex. D-5 at 175. She worked twelve hours on July 30, 2021, trying to complete work tasks before a vacation that she had scheduled six months before. Ex. D-2 at 168.

Unable "to complete all of outstanding, time-sensitive tasks before leaving" for a family vacation, she worked the first day of the scheduled vacation using her laptop. *See id.* McCrae knew Plaintiff "was struggling to complete all of these tasks but did not offer any assistance and saw no issue with [Plaintiff] working during [her] family vacation." *Id.* Plaintiff noted that "[t]his contributed to further division between" her and McCrae, and she told McCrae via text on July 31, 2021, that she was "still struggling, feeling unsupported and was not happy about having to work during [her] already limited family time." *Id.* Plaintiff found the response text insufficient: "I'm sorry you are struggling. Let's plan some time to talk when you get back and come up with a plan." *Id.*

On August 5, 2021, Defendant emailed Plaintiff a "designation notice for [her] FMLA leave" and provided instructions for taking time off under the FMLA to care for her mother. *See* Ex. D-6. Plaintiff received this while she was on vacation. Ex. D-2 at 168.

Upon her return from vacation on Tuesday, August 10, 2021, Plaintiff met with McCrae.

---

[5] "PASRR" is a complicated program for habilitation coordinators. *See* Pl.'s Dep. 50:1-3. At times, documentation includes other undefined acronyms, such as CFC, DID, and CAP, which the Court leaves in for potential context for the parties. The underlying meaning of the acronyms is unimportant to the ultimate resolution of this case.

*Id*. Hopeful that the conversation would include ways she could "be more supported and have some assistance with some of [her] assigned tasks to help decrease [her] stress and feelings of being overwhelmed," Plaintiff was disappointed when McCrae instead (1) "chastised" her about sharing her feelings via text on July 31; (2) offered no "assistance or even temporary reduction of tasks"; and turned "the nature of the meeting" in a punitive direction by stating that she wanted Plaintiff "to complete ALL of [her] working hours within a Hill Country office." *Id*. McCrae gave no "valid reason . . . for this request" and completely ignored Plaintiff's "concerns about unnecessary exposure to Covid-19." *Id*.  At this point McCrae had not requested any change to Plaintiff's Original Schedule, just that Plaintiff could not work from home. *Id*.

McCrae emailed Plaintiff a review of the matters discussed. Ex. D-4 at 174. She stated that they "discussed several areas of concern that I [(McCrae)] have with oversight and management of tasks," including prioritizing tasks that McCrae had stated "should not have been a priority" and emailing staff about referrals rather than having a conversation with them. *Id*. McCrae reiterated her request from July 9, that Plaintiff

> shift priorities and focus on improving supervision and management (standardized, routine supervision of your staff, routine monitoring of their progress notes and other work) as well as a focused effort on creating system improvements to Access and Intake (I specifically asked that you create a spreadsheet to track DID packets and scheduling).

*Id*. She summarized that during the August 10 meeting, she requested that Plaintiff "work exclusively from the office," expressed a hope "that a change in environment will help with management of tasks,"[6] and noted a "need to discuss [her work schedule] moving forward to see when would be a reasonable date for [Plaintiff] to work [her] 4 scheduled 10 hour days from the office." *Id*. She concluded the email by asking Plaintiff to "add anything [McCrae] may have missed," stated an intent to conduct weekly meetings with various agendas, which "to start will include status of

---

[6] This is consistent with deposition testimony that she directed Plaintiff to return to the office in the hope that there would be fewer distractions than when working at home. McCrae Dep. 27:7-17.

supervision meetings (data tracked and monitored), status of CAP corrections that you will be tracking, status of the internal CAP (in development) for CFC referrals, access and intake system change implementation." *Id*.

By email dated August 15, 2021, Plaintiff responded to McCrae and explained that she needed to change her schedule so that she could care for her mother and her planned change would result in her working thirty hours using her current four ten-hour workdays. Ex. D-2 at 169; Ex. D-4 at 172–74. Plaintiff commenced the responsive email by characterizing McCrae's email as "present[ing] an incomplete picture of what's actually taken place in recent months." Ex. D-4 at 172. She thus felt it to be in her own best interest to respond in writing. *Id*. In summary, her email (1) reiterates that she has been "struggling to complete all of [her] assigned duties," she has been transparent about personal issues, but has been "overwhelmed and feeling unsupported"; (2) states that she has "felt unappreciated and undervalued" the past six months; (3) clarifies the tasks she worked on during her twelve-hours of work on July 30; (4) explains why she prioritized some matters differently; and (5) sets forth her "plans moving forward." *Id*. at 172–73.

These plans were "to work 10 hour days at a Hill Country office as requested each Monday and Friday," with a request that she work at "the New Braunfels office for now." *Id*. at 173. She also informed McCrae that she had been approved for FMLA "related to the necessary caregiving [her] mother requires" and it appears she "will need to be at [her] mother's home each Tuesday and Thursday afternoon and all day each Wednesday to ensure her safety and that her needs are being met."[7] *Id*. She stated a hope to "discuss what tasks/duties [she] will be relieved of, given that [she would] only be working 75% of [her] usual hours in the foreseeable future." *Id*. She further stated that she was available for weekly meetings on Fridays. *Id*. at 174.

Plaintiff and McCrae met again on Friday, August 20, 2021. *See* Ex. D-2 at 169. "This

---

[7] For ease of reference, the Court will refer to this schedule as "Planned FMLA Schedule."

meeting was highly emotionally charged," and McCrae stated for the first time that Plaintiff "would only be permitted to work Monday-Friday from 8am-5pm." *Id.* In an August 29, 2021 email to management, Plaintiff provided her notes from the August 20 meeting, including what McCrae said to her and her responses. *See* Ex. D-7 at 178–81. McCrae asked for weekly updates about various matters. *See id.* Plaintiff stated that McCrae assigned her a new task to build a report and send it to her each Friday regarding CFC referrals. *Id.* at 179. Plaintiff expressed that this new assignment "is another reason for [her] 'defensiveness'" in that she "feel[s] as though [she] is being set up as the scapegoat for the CFC Referrals issue that has been a problem since years before [she] even came to HC in July 2019." *Id.*

McCrae, in response to Plaintiff's inquiry regarding being relieved of duties, requested that she provide "a workweek time study in 15 minute increments" due to McCrae's stated perception that she needed to know the tasks that Plaintiff spent "worktime on so [the two could] have some prioritization conversations." *Id.* at 180. McCrae further stated that she did not know what tasks could be taken from Plaintiff because she did not know what Plaintiff was doing with her work-time. *Id.* McCrae requested that Plaintiff provide the time study "at the end of next week so decisions can be made." *Id.* Plaintiff replied that she "did not believe it to be accurate that she [(McCrae)] 'doesn't know what I do with my worktime' given that my calendar has a lot of detail AND she is CCed on a majority of my email correspondence." *Id.* Plaintiff viewed the "time study" as "time-consuming" and it felt "like an insult to [her] character and an attempt at micro-management." *Id.*

McCrae told Plaintiff that "no additional support will be offered" until she completes the time study. *Id.* She told Plaintiff that "10 hour days is not something we can continue doing because it is not working for me [(McCrae)] anymore." *Id.* She informed Plaintiff that "taking Wednesdays off is not allowed moving forward." *Id.*

The next day, August 21, 2021, Plaintiff spoke to Sturdivant about her concerns and "requested assistance due to the unmanageable stress the ongoing conflict with [McCrae] was causing." Ex. D-2 at 169. She went to HR regarding the time study. *See* Pl.'s Dep. 165:6–10. She did not complete the time study. *Id*. 167:22–23. Although she objected to working a five-day workweek, she did not recall whether she told McCrae that she "could not do it because of any mental or physical impairment." *Id*. 179:7–20.

A meeting with Sturdivant on August 23, 2021, provided Plaintiff some "hope and positivity regarding her future at Hill Country," and she thanked him for his "calm, steady leadership and considerate guidance." Ex. D-10 at 199.

The next day, Plaintiff started an email chain at 8:54 a.m. by emailing her staff, her supervisor McCrae, and others that she would "be using some FMLA leave time to care for her" mother and officially set out her Planned FMLA Schedule. Ex. D-11 at 204. About an hour later, McCrae pointed out that the schedule did not include Wednesday even though when the two had last spoke, McCrae had asked Plaintiff to "begin a regular Monday – Friday, 8 hour day work week." *Id*. at 203. Apparently not realizing that Plaintiff was setting out a schedule that incorporated her planned FMLA leave, McCrae further stated: "Understanding your need to care for your mom, I explained that time you need to take off to do so would need to be done so under your FMLA time." *Id*. She also reiterated that she expected Plaintiff to "work from the office on [her] scheduled work days/hours." *Id*.

Approximately three hours later, Plaintiff explained that (1) she had not yet "spoken to HR about [McCrae's] attempt to change the schedule"; (2) when she met Sturdivant the day before, he did not tell her that she had to change her schedule; (3) as she had "already informed" McCrae, she "will be caring for [her] mother all day on Wednesdays and will not be available to work on Wednesdays at this time"; (4) she had concerns about COVID exposure; (5) she felt "under attack

10

and singled out by these demands"; and (6) she hoped to resolve the matters when she can directly speak to Fouse, as she felt "many of these decisions/directives are retaliatory in nature and causing me unnecessary, additional stress in this already very difficult time." *Id.*

Within minutes of responding to McCrae, Plaintiff also emailed management to complain about McCrae's actions. *Id.* at 202. That email states in full:

> Gentlemen, I am writing to ask for your assistance. I need someone to intervene in this situation, as it continues to escalate and I am without the mental energy or time to keep defending myself against my direct supervisor.
>
> I am trying so hard to get all of my work done and stay available for my many direct reports, but Analaura seems intent on making things as difficult as possible for me to do so.
>
> At a time when I really need increased flexibility to complete my work tasks, she is doing the total opposite and creating additional barriers.
>
> I am not sure what the solution is but I truly feel like I am being bullied and harassed at this point and it only seems to be getting worse.
>
> Please let me know what can be done.

*Id.* at 202–03. Sturdivant responded with a request for "more specific documentation of the concerns" identified, encouraged Plaintiff "to follow instructions from [her] direct supervisor and to fully execute any and all directives related to work assignments and work schedules to the best of [her] ability," and concluded with HC's commitment "to providing a work environment that is free from being 'bullied' or 'harassed.'" *Id.* at 202.

Through her August 29, 2021 email, Plaintiff provided a detailed timeline to management. *See* Ex. D-2 at 167–70. Not only did Plaintiff set out much of the above timeline in that email, but she also provided her views on the conflict:

> What I am experiencing now is a constant POWER OVER approach from my immediate supervisor and it is in total opposition to what I believed this organization stood for. Not a single conversation or explanation was given about either of these decisions before they were demanded of me: that all of my hours must be worked inside a HC office or the schedule change to only being permitted to work Monday-Friday from 8am-5pm.

> It does not make good business sense nor has any reason been given to change my schedule to M-F, 8-5. *This schedule change is illogical as it actually makes it more difficult for me to complete work tasks.* . . . Taking away my ability to work outside of the stated business hours only decreases my ability to complete all of my work tasks... especially during this unpredictable time regarding my mother's condition. With some flexibility and being permitted to keep the schedule I've had the entire time I've worked here in place, I was able to guarantee at least 30 hours weekly of work time... usually more when you factor in evenings and weekends. Under the schedule stipulations that Analaura is trying to impose: I would only be able to work 26 hours per week. How is this decision of any benefit to the agency?

*Id.* at 169. She also expressed concerns about exposure to COVID-19: "My mother's compromised immune system includes medical diagnoses that already make it difficult for her to breathe well including COPD. I am terrified of being exposed to covid unknowingly and unnecessarily and in turn infecting my mother." *Id.* In conclusion, Plaintiff asked HR to "intervene in this matter quickly." *Id.* at 170.

**D. Internal Investigation (August 31, 2021, through September 8, 2021)**

Commencing on August 31, 2021, Fouse conducted an internal investigation into Plaintiff's complaints about harassment and retaliation. *See* Ex. D-13 at 207–11. Plaintiff provided additional information. *Id.* at 207–08. She confirmed that her Original Schedule was a verbal agreement. *Id.* at 207. When asked why McCrae was retaliating against her, Plaintiff stated:

> I have had a really hard time figuring that out. The incident in June that I wrote in the timeline (reference Mid-June 2021). I think Analaura is frustrated with my personal situation. I have felt blindsided by this. Up until June, I felt like we had a true friendship until June. Once I informed her, I would be seeking FMLA, it felt like things took a more drastic turn for the worst.

*Id.* When questioned about the request for a time study, she characterized the request as "unnecessary and insulting," and from Fouse's perspective, it appeared that Plaintiff simply was not going to do it. *Id.*

Fouse interviewed staff about the June 2021 audit meeting. *Id.* at 208–10. McElligott explained that Plaintiff is her friend "outside of work," but Plaintiff "had a lack of holding her staff accountable, and during the audit there was proof of that." *Id.* at 208. Plaintiff and McCrae had a

difference of opinion regarding whether Plaintiff's staff should get a raise. *Id*. As described by McElligott, "the big picture was [Plaintiff] wasn't respecting [McCrae's] authority during the meeting," and after McCrae told Plaintiff "no several times," she "decided to shut down the meeting as it wasn't getting anywhere." *Id*. McElligott did not "think anyone [was] being singled out," and McCrae was treating everyone equally. *Id*. at 209.

Martinez saw issues commence with the raise discussion. *Id*. at 209–10. She stated that things had "gotten really uncomfortable," with Plaintiff keeping her camera off during meetings even though we have all been told to keep the cameras on. *Id*. at 210. Despite these issues, she described McCrae as "100% very supportive." *Id*. She also described Plaintiff's Original Schedule as a "perk." *Id*. at 211.

Tina Carter, another participant in the June audit meeting, recalled issues with pay raises, productivity of staff, and their lack of writing notes. *Id*. at 210. She recalled Plaintiff bringing up the raise issue "many times" even though Carter viewed the issue as already answered. *Id*.

On September 8, 2021, Fouse emailed Plaintiff a Complaint Investigation Summary and asked her to review it. Ex. D-8 at 182. The three-page summary sets out Plaintiff's August 24, 2021 email complaint regarding McCrae and the concerns discussed, including (1) being "treated differently and retaliated against by [McCrae] because you [(Plaintiff)] feel she is frustrated with your personal situation, and more specifically, because you informed her you would be seeking FMLA"; (2) the change in Plaintiff's work schedule and elimination of permission for her to telework from home; and (3) "allegations of bullying and harassment" asserted against McCrae. *See id*. at 184–86.

Management confirmed that since Plaintiff requested FMLA leave on July 13, 2021, she had requested and used fourteen hours of FMLA time—four hours on July 12 and ten hours on July 13. *Id*. at 185. Although HC has approved FMLA leave for two half days and one full day off

13

and no supervisor can interfere with this time off, Plaintiff must mark such time as FMLA on her timesheet. *Id*.

Management also reached several conclusions regarding Plaintiff's work schedule and location. *Id*. at 185–86. First, they confirmed that McCrae agreed to the Original Schedule that Plaintiff had requested in her interview, but "there is no written agreement or contract" regarding that agreement. *Id*. at 185. Next, they viewed the adjustment of Plaintiff's schedule reasonable "as all other supervisors and employees under her direction are expected to be available Monday through Friday between the hours of 8:00 am and 5:00 pm." *Id*. They recognized McCrae's operational concern about productivity and activity as the primary reason for the schedule change. *Id*. They recognized the requested time study as McCrae's attempt "to help prioritize and reduce [Plaintiff's] workload." *Id*. Finally, they informed Plaintiff that if she refused to provide McCrae with "a time study and to work the new schedule as directed, this would be considered insubordination, which is listed as prohibited conduct" in HC's policies. *Id*. at 186. With respect to the elimination of telework, they provided Plaintiff with information about requesting a reasonable accommodation under the ADA should she feel she was at risk. *Id*.

Management was unable to confirm the allegations of harassment and bullying and "found no policy violations" by McCrae. *Id*. Fouse asked Plaintiff to forward any further information she may have and stated that, if she did not have any further information, he would "consider this investigation closed." *Id*. He ended the summary by expressing that HC values her as an employee and provided her two recommendations: (1) continue in her current position and follow the direction of McCrae or (2) apply for another HC position through the normal application process. *Id*. He also "attached the ADA request for reasonable accommodation paperwork." *Id*. at 182.

**E. Plaintiff's Final Weeks of Employment**

The morning of September 16, 2021, McCrae emailed Plaintiff regarding whether she had

received COVID test results and inquiring as to when she will be returning to work. *See* Ex. D-14 at 213. At 1:59 p.m., McCrae informed Plaintiff "that three consecutive sick days require and a doctors [sic] note, and additionally sick time would not be approved preemptively unless for a medical appointment or another similar situation." *Id*. at 212. McCrae asked Plaintiff to "clarify that you understand these requests do not comply with Hill Country policy." *Id*. At 4:20 p.m., McCrae, with a cc to Fouse, emailed Plaintiff to inform her that the time off requests had "been denied" based on her use of "sick time," and asked for her confirmation that she understood that. *Id*. At around 7:00 p.m., Plaintiff emailed McCrae and Fouse that she (1) had received her test results earlier in the day and "tested negative," (2) had submitted a doctor's note to cover September 9 through 19 and has updated her leave requests accordingly, (3) changed her "mental health days" to "vacation days" for September 20 and 21, (4) would be caregiving for her mother on September 22 and has entered that request as FMLA leave, and (5) would be returning to the office on September 23. *Id*.

On September 22, 2021, Fouse placed Plaintiff on administrative leave following a special investigation. *See* Ex. D-16 at 219. He informed her that this was leave with pay and "is not considered disciplinary action." *Id*. Plaintiff received and signed the document on September 23, 2021. *See id*.

Fouse and McCrae met with Plaintiff on Tuesday, September 28, 2021, at 11:00 a.m. to provide Plaintiff "with written notice of the areas of concerns with [her] performance [they] would be discussing." Ex. D-18 at 228. They also provided Plaintiff "additional time to respond in writing." *Id*. At 11:05 a.m., on that same date, Fouse emailed Plaintiff an attachment to describe her performance problems. *See* Ex. D-15 at 214. He described issues of unresolved documentation, caseload management, access and eligibility, insubordinate behavior, assigned enrollments, and PASRR reporting. *See id*. at 214–18.

Defendant provides a transcript of an audio file of that meeting. *See* Tr. Sept. 28 Meeting (ECF No. 19-2, Ex. E). Plaintiff reviewed the written concerns during the meeting. *See id*. 2:16-3:11. Among other matters, they discussed Plaintiff's failure to provide McCrae a time study as requested. *See id*. 18:5-20:10. Plaintiff questioned McCrae's position that she (McCrae) was una-ware of what Plaintiff did during work—pointing to her detailed calendar. *Id*. 18:5-12. But Fouse pointed out that the issue is that McCrae as her supervisor asked her to do something because she (Plaintiff) had requested a reduced work load—a seemingly simple task—and Plaintiff's "outright refusal to do it is, basically, insubordination." *Id*. 18:16-19:6. He restated that every time McCrae asked Plaintiff "to do something she gets blowback or . . . just flat-out refusal to do it, and . . . that's where . . . insubordination comes in." *Id*. 19:24-20:4. To which, Plaintiff disagreed by again pointing to her detailed calendar. *Id*. 20:5-10.

Plaintiff described her communication with McCrae as "fractured and broken and very, very strained." *Id*. 23:7-9. When McCrae pointed out that Plaintiff had still not submitted the re-quested time study, Plaintiff stated that she (1) "had been asking [McCrae] for help for three months"; (2) felt like she only received "punitive retaliatory decisions" from McCrae rather than assistance or help; (3) and viewed it as "micromanagement" and "so indicative of the lack of su-pervisory experience." *Id*. 23:20-24-14. Plaintiff expressed "shock that Hill Country allows their employees to be treated like this." *Id*. 24:23-24. She expected "more flexibility and "more assis-tance." *Id*. 25:4-5. But she viewed McCrae's "response has been micromanaged to the point of, you can only work in this building at these times, and making things just much more difficult for me [(Plaintiff)] to complete my job." *Id*. 25:7-10. Plaintiff also addressed communication issues and her working relationship with McCrae:

> The lack of communication goes both ways, Analaura.· You have not communi-cated effectively with me for months either.· So it isn't just one -- it takes two to communicate.· It is not just me not communicating with you.· There are many times I will send you an IM.· I will send you a text. It will be about an urgent work-related

activity and you won't even respond or you'll respond six or seven hours later.· So the communication issue is mutual, due to the unfortunate disintegration of our working relationship.

*Id*. 25:10-20.

Fouse pointedly asked whether Plaintiff thought she would be "able to work in [her] current position," to which Plaintiff responded "[n]ot with [her] current supervisor." *Id*. 38:10-13. Plaintiff elaborated that the trust was "so fractured" that she did "not think [she] could remain being super-vised by [McCrae] in any capacity." *Id*. 38:15-22. She further stated:

> And at this time, I would expect – because I work for a mental health authority -- for there to be more compassion, more consideration, and more support. I'm just completely disappointed with the way that this has been handled and with her lead-ership, and I think her lack of supervisory experience is – I'm paying the price for it, at this point.· So, no, I don't think I could ever work directly under Analaura again, and I don't know what that means in the long run.
>
> I know I have an opportunity to switch to a -- another role in a different department.· However, I do feel that Analaura will do all she can to derail that opportunity.· I find it fascinating that I let her know on Wednesday at 1:00 p.m. that I applied for that position and on Wednesday at 5:04, I got placed on administrative leave.· So -- so much of this feels such -- like a personal attack and it's retaliatory. And allow -- allowing Analaura to conduct an investigation on me, after I filed a complaint against her, really is completely illogical to me and seems very irresponsible and I just want that . . . documented.

*Id*. 39:11-40:8. Fouse explained that only a supervisor who knows the job "can do a performance-type investigation" on an employee. *Id*. 40:9-12. And the supervisor is the one who gives instruc-tions in accordance with the employee's job description, not HR. *Id*. 40:18-25. He further ex-plained that Plaintiff's response to her supervisor and how she responded, "is of vital importance." *Id*. 41:1-3. Referencing the time study again, he stated that Plaintiff "thought it was ridiculous" and "refused to do it," which he viewed as "flat-out insubordination." *Id*. 41:4-6. Plaintiff defended her actions as not insubordination or "an outright refusal" to do it, but her calendar already had the requested information. *See id*. 41:24-42:6.

Fouse and McCrae explained that, while covering from Plaintiff when she was off work in September, McCrae uncovered a lot of Plaintiff's performance issues. *Id*. 43:20-44:7. McCrae

stated that she tried to provide Plaintiff with "valuable feedback" on July 9, but Plaintiff responded "with a lot of defensiveness" and disagreement. *Id*. 44:11-16; 45:11-13. And according to McCrae, Plaintiff did not address or do things requested of her. *Id*. 44:18-21. As Plaintiff continued to disagree, McCrae explained that this is "a case of insubordination in the sense that I am telling you, and have told you, this is what I need to have happen and you have not followed those directions." *Id*. 47:23-48:14.

Plaintiff later asked McCrae to leave the video call so that she could speak only to Fouse. *Id*. 50:20-24. Fouse informed Plaintiff that another person had reviewed her complaint against McCrae and Fouse believed that other reviewer agreed with his response and assessment based on the documentation she viewed. *Id*. 51:13-15. During this one-on-one conversation, Plaintiff expressed a desire to be "out from under" McCrae's supervision because she did not trust McCrae. *Id*. 52:7-9.

The next night, Plaintiff emailed a written response to the described performance issues. *See* Ex. D-17 at 220–27. Given her time out of the office in September, she stated that nonresponses to emails during her time off (September 9 through September 23) should not be included as performance issues. *Id*. at 220. She stated disagreement with unresolved documentation and PASSR issues, as well as problems with access and eligibility. *See id*. at 220–24. As for problems with case management, she concedes some issues while stating that some are inaccurate. *Id*. at 221–22. She disagreed with allegations of insubordination, and with respect to her failure to provide McCrae a time study, she reiterated that McCrae knew how she (Plaintiff) was spending her time because her "calendar contains a detailed accounting of how [her] work time is spent" and it was her practice to cc McCrae on most outgoing emails. *Id*. at 224–25. As to enrollment problems, Plaintiff stated that it was common practice to delegate tasks to staff members, expressed a need to access her emails for a proper response, and expressed concern that HR lacks "the subject-matter

expertise to understand these types of nuanced scenarios." *Id*. at 225–26. She pointed to her time away from the office in September to explain her failure to complete a PASSR report due on September 14. *Id*. at 226–27.

On September 30, 2021, Fouse met with Plaintiff to offer an opportunity for her to resign instead of being terminated. *See* Tr. Sept. 30 Meeting (ECF No. 19-2, Ex. F) 2:14-22. She conceded a mutual "communication breakdown" between her and McCrae. *Id*. 3:7-10. She no longer trusted McCrae. *Id*. 3:11. She wanted to move to another department, but Fouse stated that was not an "option at this point." *Id*. 3:18-23. He explained that her "lack of respect for [McCrae] as a supervisor" precluded Defendant from allowing her to continue in her current position or any other position unless Plaintiff was "willing to accept some responsibility for the insubordination" she had shown. *Id*. 4:11-16. Because Plaintiff had stated that she could not work with McCrae—that she refused to work with McCrae—Fouse saw no alternative but to let Plaintiff go. *Id*. 4:19-22. Plaintiff explained that she did not believe she could be a direct report to McCrae. *Id*. 4:23-5:1.

Fouse stated that, since the September 8 summary, "many things performance-wise" were uncovered as others filled in for Plaintiff while she was off work in September. *Id*. 7:22-8:2. And Fouse viewed Plaintiff's response to those matters as "continued insubordination." *Id*. 8:1-4. He pointed out that he suggested in the memo that Plaintiff follow her "supervisor's instructions," but she "continued to belabor the point that [she] didn't feel like [the time study] was necessary, so [she wasn't] going to do it." *Id*. 8:5-14. He saw this as "one example of the continued insubordination." *Id*. 8-14-15. When Plaintiff indicated that she "would not be voluntarily resigning," Fouse finished the meeting and sent her a termination notice. *Id*. 9:24-10:8. In pertinent part, the Termination Notice states:

> Although the issues concerning your serious lack of performance in several areas is indeed troubling, your behavior during our meeting is intolerable.
>
> You have displayed repeated incidents of gross insubordination to your supervisor

for months, but your continued and escalating insubordination Tuesday when we were affording you the time and opportunity in great detail to understand and address your performance issue was inexcusable and will not be allowed to continue. Your behavior has been and continues to be disruptive to your team and the work that must be done, based on which you were brought into the organization specifically to address; but Tuesday's conduct of continued insubordination and your stated refusal to work with your supervisor any longer, we are terminating your employment, effective immediately.

Ex. D-18 at 228.

## F. Other Relevant Background

After McCrae changed her schedule to a five-day week, Plaintiff never provided HC "with documentation from a healthcare provider to support the idea that [she] needed to work a four-day, 10-hour per day work week, with Wednesdays off." Pl.'s Dep. 106:4-106:10. Plaintiff did not recall whether, after the schedule change, she told anyone she could not perform the essential functions of her job without having Wednesdays off. *Id.* 105:4-14.

Fouse testified that he did not "consider a progressive discipline policy" because Plaintiff "was blatantly insubordinate." Fouse Dep. 49:18-21. And by "blatantly insubordinate" he meant that Plaintiff refused to follow McCrae's "directions or work with [her]." *Id.* 49:22-50:4.

## G. Procedural Background

Through Plaintiff's Second Amended Complaint asserts a variety of claims. *See* SAC at 1–7. However, at the Initial Pretrial Conference, the Plaintiff clarified that the only claims she is pursuing are claims under the ADA for failure to accommodate, discrimination, and retaliation. *See* ECF No. 13. Defendant timely moved for summary judgment on these claims. *See* Mot. at 1. The motion is fully briefed and ready for ruling.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and

facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This includes identifying those portions of the record that the party contends demonstrate the absence of a genuine dispute of material fact. *Id.*

When "the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a genuine dispute] of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (quoting *In re: La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). The movant need not "negate the elements of the nonmovant's case." *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (emphasis omitted) (parenthetically quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994) (en banc)). In these instances, however, the movant must "point[] out that there is no evidence to support a *specific element* of the nonmovant's claim"; rather than making "a conclusory assertion that the nonmovant has no evidence to support his *case*." *Id.* at 335 n.10.

When considering a motion for summary judgment, courts view all facts and reasonable

inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. ANALYSIS

Through her Second Amended Complaint, Plaintiff brings three distinct claims under the ADA—discrimination, failure to accommodate, and retaliation. She has confirmed that she is not asserting any other claims. *See* ECF No. 13. And in response to the motion for summary judgment, she concedes that she pursues the three identified claims.

Defendant asserts that it is entitled to summary judgment on several grounds. It argues that Plaintiff cannot establish a prima facie case for any of her claims. With respect to the disability discrimination claim, it argues that she is not disabled, was not qualified, and was not terminated because she had a disability. With respect to the retaliation claim, it argues that Plaintiff did not engage in an activity protected by the ADA and cannot show a causal connection between any protected activity and her termination. It further argues that there is no evidence that its proffered, legitimate, non-discriminatory and non-retaliatory reason for her termination was a pretext for discrimination or retaliation.

Similarly, Defendant argues it is entitled on failure to accommodate claim because (1)

Plaintiff is not a qualified individual with a disability; (2) even if she had a disability, it did not know of the disability nor its consequential limitations; and (3) she never requested a disability accommodation. And, to the extent her request for a reduced workload is considered as such a request, she refused to work with HC to address such request.

In response, Plaintiff asserts that Defendant acknowledged her medical conditions when it hired her and approved her Original Schedule. She states that she successfully performed her job with accommodations, she subsequently requested a temporary reduced workload to manage renewed symptoms related to her medical conditions and Defendant failed to adequately engage in the interactive process required under the ADA, 42 U.S.C. § 12112(b)(5)(A). She contends that Defendant instead removed her prior work schedule accommodation. She asserts that she further engaged in protected activity by requesting a subsequent accommodation and then filing a formal discrimination complaint.

## A. Summary Judgment Burden

Because Plaintiff has the burden of proof at trial, Defendant may carry its summary judgment burden by merely pointing to an absence of evidence to support particular elements of asserted claims. Defendant here both points to an absence of evidence and presents evidence to negate elements of Plaintiff's claims, even though it has no need to do the latter. By carrying its summary judgment burden, Defendant shifts the burden to Plaintiff to show that there is a genuine dispute of material fact for her claims.

At the outset, the Court notes that Plaintiff's positions are often only supported by her deposition testimony. In some instances, this may present an evidentiary issue for a plaintiff. However, "'self-serving' affidavits and depositions may create fact issues even if not supported by the rest of the record." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). Courts may not discount affidavits or deposition testimony "just because they happen to be self-

interested," when the submissions are otherwise competent evidence. *Id*. at 160–61. This is so, because the "weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage." *Id*. at 161.

Submitted summary judgment evidence "must only comport with the standard requirements of" Fed. R. Civ. P. 56. *Id*. "Self-serving affidavits and declarations like all summary judgment evidence, must 'be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id*. (quoting Fed. R. Civ. P. 56(c)(4)). Regardless, "facts must be particularized, not vague or conclusory." *Id*.

When the proponent of evidence satisfies "these requirements," submitted "self-serving evidence is sufficient to create a genuine [dispute] of material fact." *Id*. (replacing former operative word, "issue," with now utilized "dispute"). But when self-serving evidence is "either conclusory, vague, or not based on personal knowledge," courts properly find such evidence insufficient to create a genuine dispute of material fact. *Id*.

With these legal principles in mind, the Court proceeds to the claims asserted. It begins with the reasonable accommodation claim because that claim does not invoke the *McDonnell Douglas*[8] burden-shifting framework. *See Thompson v. Microsoft Corp.*, 2 F.4th 460, 467, 470 (5th Cir. 2021) (applying *McDonnell Douglas* to disability-discrimination claim but not to failure-to-accommodate claim at the summary judgment stage); *Tran v. Pflugerville Indep. Sch. Dist.*, No. A-13-CA-145 DAE, 2014 WL 12160774, at *4 (W.D. Tex. May 23, 2014) (recommendation of Mag. J. noting that "*McDonnell Douglas* is not applicable to a failure to accommodate claim") *adopted sub nom. by Tran v. Plugerville Indep. Sch. Dist.*, No. A-13-CV-145-DAE, 2014 WL 12160775 (W.D. Tex. June 17, 2014).

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**B. Reasonable Accommodation Claim**

Plaintiff's reasonable accommodation claim relates to her Original Schedule, her revised schedule, and her request for a workload reduction. Resp. at 5–6. She argues that upon her hiring, she requested, and Defendant approved an accommodated schedule consisting of a "four-day, ten-hour work week, with Wednesdays off, to address fatigue and vocal cord damage." *Id*. at 5. Then in mid-July 2021, she requested and was granted FMLA medical leave to care for her mother. *Id*. While recognizing that she does not assert a FMLA claim, she contends that "the emotional and physical toll of caring for her mother during the relevant period exacerbated Plaintiff's own preexisting medical conditions, including anxiety, fatigue, and memory-related challenges." Resp. at 5–6 (citing Pl.'s Dep. 153:12-13, 155:3-5; Ex. D-2 at 167–70). She thus asked "for additional support and for some work tasks to be removed and reassigned" due to her "physical and mental impairments." Pl.'s Dep. 155:6-13.

Plaintiff states that, after she requested the temporary reduction in workload in July 2021, McCrae directed her to complete a time study and during this "same period of time, McCrae changed Plaintiff's schedule to a five-day work week." Resp. at 6. Plaintiff argues that, on August 10, 2021, she "asked McCrae to retain her original schedule as an accommodation for her own ongoing medical issues." *Id*. (no citation to the record) And, she contends that she "submitted her accommodation requests via email" on August 15, 2021. *Id*. (citing Ex. D-4 at 172–74).

Before addressing the substance of Plaintiff's reasonable accommodation claim, the Court must harmonize the above timeline with the submitted evidence viewed in a light most favorable to Plaintiff. To be clear, the evidence shows that, as of August 10, 2021, Defendant had made no change to Plaintiff's Original Schedule. On that date, McCrae told Plaintiff that she (McCrae) wanted her (Plaintiff) to complete all work hours at a HC office. Ex. D-2 at 168. But this did not alter any aspect of the Original Schedule, as Plaintiff worked from HC offices when she

commenced her employment. McCrae's Dep. 26:4-27:6; Pl.'s Dep. 151:20-22. COVID-19, not any ADA accommodation, changed the HC work environment in March 2020. McCrae's Dep. 26:4-27:6. McCrae, furthermore, did not completely end teleworking for Plaintiff on August 10, 2021—understanding that Plaintiff could "not commit to working from the office every day at this time" but could work "all day Monday and Friday from the office," McCrae informed Plaintiff that they will "need to discuss this moving forward to see when would be a reasonable date for [Plaintiff] to work [her] 4 scheduled 10 hour days from the office." Ex. D-2 at 168. Additionally, the summary judgment evidence shows that McCrae did not alter Plaintiff's Original Schedule until August 20, 2021. *See id.* at 167 (stating that the Original Schedule had "never been expressed as an issue until 8/20/2021"); 169 (identifying August 20, 2021, as "the first time [McCrae] ever stated there was an issue with my work schedule of four 10 hour days and she said I would only be permitted to work Monday-Friday from 8am-5pm"). Thus, when Plaintiff contends that she submitted her requests for accommodation via email on August 15, 2021, such request could not have sought any accommodation as to retaining her Original Schedule. With this harmonization in mind, the Court proceeds to the substance of Plaintiff's reasonable accommodation claim.

In response to various judicial decisions, "Congress enacted the ADA Amendments Act of 2008 ("ADAAA") with the goal of 'reinstating a broad scope of protection to be available under the ADA.'" *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 479 (5th Cir. 2023) (quoting Pub. L. No. 110-325, § 2(a), 122 Stat. 3554). It is thus important to apply cases that themselves apply post-ADAAA law. *Id.* at 481 (describing post-ADAAA cases that applied pre-ADAAA case law as "inapposite").

A discrimination claim under the ADA includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the] covered entity can demonstrate that the accommodation would impose

an undue hardship on the operation of the business of such covered entity." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A), which was not amended by ADAAA); *accord Mueck*, 75 F.4th at 485. "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) [s]he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015); *accord Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013) (discussing such claims after the ADAAA changed some statutory provisions).

"An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *Chevron*, 570 F.3d at 621(citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)); *accord Mueck*, 75 F.4th at 485. A failure to meet this threshold matter, i.e., requesting an accommodation, "will doom a claim," especially when the "employee's disability is not obvious." *Mueck*, 75 F.4th at 485. "When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 468–69 (5th Cir. 2021) (quoting *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)). Employers violate the ADA when they are "unwilling[ ] to engage in a good faith interactive process." *Id*. (citation omitted).  But employers are "free to" provide a "less expensive accommodation or the accommodation that is easier for it to provide" and need not provide "the employee's preferred accommodation." *Id*. (citation omitted). And "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)) (cited with approval in *Mueck*, 75 F.4th at 486).

For purposes of the instant motion, the Court will assume without deciding that Plaintiff is a qualified individual with a disability and that Defendant knew of her disability and its consequential limitations. Plaintiff has provided testimony that her Original Schedule resulted from discussions at her interview regarding her medical condition and a stated inability to work five consecutive days. Because an employee need not "mention the ADA or use the phrase 'reasonable accommodation," while explaining the need for "adjustment in working conditions or duties" due to "a medical condition-related reason," *Chevron*, 570 F.3d at 621, the Court finds that, viewing the evidence in the light most favorable to the Plaintiff, she satisfied her responsibility of informing HC of her medical limitation to not work five consecutive days. And there is no question that her Original Schedule afforded her that accommodation whether or not HC recognized the schedule as a medical condition-related accommodation. Because Plaintiff received the accommodation requested, she has no reasonable accommodation claim when first hired.

Arguably, an employer violates the ADA by withdrawing a prior accommodation without suggesting an adequate substitute. *Loulseged*, 178 F.3d at 734 (discussing such argument from the plaintiff). But the withdrawal of a previously provided accommodation, does not constitute an ADA violation of itself—rather, such withdrawal of an accommodation recommences the interactive process designed to create a reasonable accommodation. *See id*. at 734–38. When an employee is not "faced with the problematic job duties immediately," the employer is "under no obligation to make a formal presentation" to the employee of a proposed accommodation. *Id*. at 737. Employers need not "move with maximum speed to complete this process and preempt any possible concerns." *Id*. Employers may instead "move at whatever pace [they choose] as long as the ultimate problem—the employee's performance of her duties—is not truly imminent." *Id*.

Here, viewing the evidence in the light most favorable to the Plaintiff, HC arguably removed the reasonable accommodation previously afforded to Plaintiff, i.e., her Original Schedule,

on August 20, 2021, when McCrae unilaterally changed Plaintiff's schedule to eliminate ten-hour workdays and Wednesdays off. But that change is not viewed in isolation. Many relevant things had happened prior to that changed schedule. First, McCrae discovered performance issues with Plaintiff and those Plaintiff supervised during the audit preparation in June 2021, which led to a meeting to discuss those issues on July 9, 2021. Then, four days later, Plaintiff stated an intent to request FMLA time to care for her mother.

At a second meeting on August 10, 2021, McCrae eliminated teleworking for Plaintiff with some ability to ease into the requirement to work only from the office. McCrae also specifically left open further discussion of the matter. Then, five days later, Plaintiff informed McCrae that the need for FMLA leave will alter her work schedule to thirty hours, ten hours each on Monday and Friday, with five hours each on Tuesday and Thursday. This led to the August 20, 2021 meeting where McCrae, not only informed Plaintiff of the unilateral schedule change, but also requested that Plaintiff provide a time study after Plaintiff requested to be relieved of duties in light of her reduced hours.

Thus, as of August 20, 2021, the FMLA circumstances had effectively altered Plaintiff's schedule to working less than a full, forty hours. Eliminating Wednesdays off was not going to compel Plaintiff to work five consecutive days, because she would be taking FMLA time for Wednesdays and half of each Tuesday and Thursday. Plaintiff confirmed her FMLA plan on August 24, 2021, which prompted McCrae to remind Plaintiff that it was expected that Plaintiff would work a regular 8-to-5 schedule each day from the office unless she was using FMLA leave. This dialog prompted Plaintiff to reiterate that not only had she already informed McCrae that Wednesdays would be FMLA days, but that HR had not yet verified any change of schedule for her. As for coming into the office, she also expressed concerns about COVID exposure. Minutes thereafter Plaintiff emailed Fouse and Sturdivant to complain about McCrae's actions. Later that afternoon,

Sturdivant sought specific documentation and encouraged Plaintiff to follow McCrae's instructions and directives.

On August 29, 2021, Plaintiff emailed the requested documentation to management, elaborated on her Original Schedule, and noted various impairments but does not connect any impairment or limitation to the need for her Original Schedule. The only limitations she mentions are a susceptibility "to viruses and upper respiratory infections" and difficulty "wearing a mask for long periods of time." Ex. D-2 at 167. With respect to her Wednesdays off, she merely states she has tried her best to schedule any appointments for herself, her children, or her mother "for Wednesdays in order to minimize any impact on [her] work availability." *See id.* In responding to Plaintiff's complaint against McCrae and summarizing management's conclusions on September 8, 2021, Fouse sent her paperwork for requesting an ADA accommodation regarding her work location and COVID concerns. Ex. D-8 at 184–86.

Viewing the evidence in the light most favorable to Plaintiff, the Court cannot find that the recission of her Original Schedule violates the ADA. At that point, the schedule modification along with all other relevant circumstances were to be considered through a recommenced interactive process tailored to create a reasonable accommodation for Plaintiff's reported limitations from her disability. Working five consecutive days was no longer an issue given the FMLA leave Plaintiff was taking to care for her mother. At that time there was no truly imminent need for the Original Schedule. As for her work location, Plaintiff had agreed to work all day Monday and Friday in the office—the disagreement focused on whether Plaintiff had to work her half-day Tuesdays and Thursdays in the office. Management sent her an ADA request form, which she did not return. Plaintiff had also requested a temporary workload reduction, to which McCrae asked her to complete a time study. Plaintiff did not complete the task.

In a nutshell, after McCrae indicated that she expected Plaintiff's schedule to change and

Plaintiff requested a reduction in her workload, there is no evidence that Defendant failed to engage in a good faith interactive process or to make a reasonable accommodation. At most, the request for workload reduction commenced the interactive process for determining a reasonable accommodation.[9] McCrae properly advanced that interactive process by asking Plaintiff to prepare a time study so that McCrae could determine what tasks might be removed. By not completing the requested time study, the responsibility for the breakdown of the informal, interactive process lies with Plaintiff, not Defendant. Similarly, Plaintiff expressed concerns about returning to the office every day but failed to complete the paperwork provided to her. Furthermore, her FMLA leave was resolving any need for her to work five consecutive days, and she did not raise that as a basis for any new accommodation when McCrae was changing her schedule.

Plaintiff argues that Defendant fired her before she could return the accommodation form provided to her. Resp. at 18. Defendant sent her that form on September 8, 2021, when it completed the internal investigation of Plaintiff's complaint about McCrae. During Plaintiff's absences from work during September 2021, Defendant found additional performance issues of Plaintiff. And McCrae had already spoken to Plaintiff about performance issues discovered during the June 2021 audit. Some of these issues related to Plaintiff's supervision of her staff and their production, while others related to Plaintiff's own responses when matters were brought to her attention. On the facts of this case, Plaintiff's failure-to-accommodate claim fails because the facts, even when viewed in the light most favorable to Plaintiff, do not show a failure to make reasonable accommodations for Plaintiff's limitations. Rather, Defendant provided a modified schedule that addressed Plaintiff's pre-hiring concerns about working five consecutive days. That accommodation, whether considered by Defendant to be an accommodation or not, fulfilled Defendant's ADA obligations for any

---

[9] The Court considers the request for workload reduction to be synonymous with her request for additional assistance. Furthermore, Plaintiff mentions a "request to continue to be allowed extra time to review materials and take notes," Resp. at 17 (citing Ex. D-2 at 167–70), but the citation to the record reveals no such request.

request for accommodation that Plaintiff made pre-hiring. Plaintiff does not contend that she made any other requests for accommodation until the July-August 2021 timeframe when numerous factors coalesced to have Plaintiff request FMLA leave, McCrae to change Plaintiff's schedule and work location, and Plaintiff to make requests for accommodation that recommenced the informal, interactive process. But ultimately, Plaintiff's own actions interfered in the process thereby making her responsible for the breakdown. Because the breakdown is traceable to Plaintiff, Defendant cannot be found to have violated the ADA for a failure to accommodate.

To the extent Plaintiff has a viable claim under the ADA, it is not based on a failure to accommodate. The Court thus proceeds to Plaintiff's ADA discrimination claim.

## C. ADA Disability Discrimination

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability" by employers." *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 483 (5th Cir. 2023) (citing 42 U.S.C. § 12112(a)). When, as here, Plaintiff's ADA claims are based on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *See id.*

In *McDonnell Douglas*, the Supreme Court "laid out a three-step burden-shifting framework for evaluating" discrimination claims. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025). This "framework aims to 'bring the litigants and the court expeditiously and fairly to th[e] ultimate question' . . . namely, whether 'the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The Supreme Court has assumed without deciding that the "framework applies at the summary-judgment stage of litigation," *id.* at 308 n.2, and this Court will do the same.

The framework first places upon the plaintiff "the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to support an inference of discriminatory motive." *Id.* at 308 (quoting *McDonnell Douglas*, 411 U.S. at 802). In general, this "step of the *McDonnell*

*Douglas* framework—the prima facie burden—is 'not onerous.'" *Id*. at 309 (quoting *Burdine*, 450 U.S. at 253). And the Supreme Court "has repeatedly explained that the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Id*. at 310–11 (citations and internal quotation marks omitted). In the ADA discrimination context, the prima facie case requires the plaintiff (1) to have a disability; (2) be "qualified for the job," and (3) be "subject to an adverse employment decision on account of [the] disability." *Mueck*, 75 F.4th at 483 (quoting *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020)).

  If the plaintiff carries the initial prima facie burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, after which the plaintiff bears the burden to prove that the employer's explanation was a pretext for discrimination." *Id*. (citation and internal quotation marks omitted); *accord Ames*, 605 U.S. at 308–09. When the employer "articulates such a justification, the plaintiff must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Ames*, 605 U.S. at 309 (quoting *McDonnell Douglas*, 411 U.S. at 804). This opportunity provides plaintiffs with two avenues to show pretext—"either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "To carry the burden of showing pretext, '[t]he plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates.'" *Mueck*, 75 F.4th at 483 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).

  Undoubtedly, there are numerous issues involved in succeeding on an ADA claim. And in some circumstances, courts may "assume without deciding" particular issues for the sake of "judicial economy." *See id*. at 484. One such circumstance is when the employer has asserted a

legitimate, non-discriminatory reason and the Plaintiff has failed to carry her burden regarding pretext. Thus, the Court will assume without deciding that Plaintiff has presented a prima facie case of discrimination.

Defendant states that it terminated Plaintiff for insubordination, which it repeatedly discussed with Plaintiff and included in the Notice of Termination. Plaintiff argues that Defendant's assertion that it terminated her "for insubordination and poor performance is unsupported by the record and raises significant issues of pretext." Resp. at 13. She testified that she did not refuse to comply with the directive to complete a time study but instead sought clarification regarding its purpose. While the evidence shows that Plaintiff sought clarification about the request for a time study, the evidence also definitively shows that she intentionally chose not to complete the requested task. She felt singled out, but she was the one who asked for a workload reduction. That request prompted McCrae to explore what tasks might be taken from Plaintiff. The first step in that process was for Plaintiff to provide a time study, which she never did.

Defendant has proffered a legitimate, non-discriminatory reason for its adverse employment actions against Plaintiff. It is well-documented that it terminated her for insubordination, which was repeatedly discussed with her and included in her notice of termination. She refused to follow McCrae's instruction to create a time study, she spoke to McCrae in a disrespectful manner, and she refused to work for McCrae going forward. Each is a stated insubordination. Plaintiff has presented nothing to show that the reasons for her termination or other adverse employment action were a pretext for disability discrimination. Nothing points to any disability being any type of factor in the actions taken against Plaintiff.

Plaintiff argues that Defendant's claim of insubordination depends on a deliberate refusal to comply with directives and thus presents a factual matter requiring trial. Resp. at 14. But this argument ignores the other performance issues thoroughly discussed with Plaintiff throughout the

last four months of her employment.

Plaintiff also argues that an employer's contradictions, shifting explanations, or a lack of contemporaneous evidence can serve as circumstantial evidence of pretext. *Id*. at 15 (relying on *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 233 (5th Cir. 2015)). The facts of this case are materially different than in *Burton*. Although additional performance issues were uncovered or arose as Defendant proceeded from the initial discovery of issues in June 2021 through continued discussions of the issues in July and August 2021 and the September 2021 internal investigation, the summary judgment evidence does not show contradictions, shifting explanations, or a lack of contemporaneous evidence. Plaintiff has produced no substantial evidence of pretext. "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Burton*, 798 F.3d at 233. The evidence here is not of such quality or weight.

Plaintiff next argues that the temporal proximity between her termination and her requests for accommodations, Defendant's failure to adequately engage in the interactive process, and deviations from its own policies undermine the credibility of Defendant's proffered reason for her firing. Resp. at 15. The Court has already addressed the interactive process and found that when viewed in the light most favorable to the Plaintiff, she was ultimately the source of the breakdown in that process. Plaintiff has not provided evidence that Defendant's proffered explanation for its adverse employment actions against Plaintiff is unworthy of credence or belief. She has not shown the proffered reasons to be a pretext for discrimination.

**D. ADA Retaliation**

"The ADA prohibits retaliation against an individual who 'has opposed any act or practice made unlawful by this chapter.'" *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 488 (5th Cir. 2023) (quoting 42 U.S.C. § 12203(a)). Like the ADA discrimination claim addressed above,

"a retaliation claim not supported by direct evidence is evaluated under the *McDonnell Douglas* burden-shifting framework." *Id*. To "establish a prima facie case of unlawful retaliation," Plaintiff must show (1) participation "in an activity protected under the statute;" (2) her "employer took an adverse employment action against" her; and (3) "a causal connection exists between the protected activity and the adverse action." *Id*. (quoting *Feist v. La. Dep't of Just.*, 730 F.3d 450, 454 (5th Cir. 2013)). And if Plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Feist*, 730 F.3d at 454; *accord Mueck*, 75 F.4th at 488 n.16; *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 306 (5th Cir. 2020).

As it did for the above ADA discrimination claim, the Court will assume without deciding that Plaintiff has presented a prima facie case of retaliation. And, as discussed in the prior section, Defendant has stated a legitimate, non-retaliatory reason for its adverse employment action. Evidence of poor work performance satisfies the employer's burden. *Feist*, 730 F.3d at 455 (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684–85 (5th Cir. 2001)). Defendant has provided evidence that performance issues were uncovered in June 2021 during an audit preparation. It has provided evidence that Plaintiff was not receptive to proposed changes intended to help her with such issues. It has provided evidence that she was insubordinate in failing to complete requested tasks, as well as in her tone and interactions with supervisors. It has provided summary judgment evidence that the decision to terminate Plaintiff was based solely on her conduct.

Once the employer proffers such a reason, the burden shifts back to Plaintiff to show that the "stated reasons is a pretext for retaliation." *Lyons*, 964 F.3d at 306. This requires the Plaintiff to show "that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist*, 730 F.3d at 454. Making such showing requires "'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected

activity." *Id.* (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)). Plaintiff must "offer some evidence from which a jury could infer that retaliation was the real motive" for the adverse employment actions taken against her. *See Lyons*, 964 F.3d at 306.

Plaintiff fails to present such evidence. She relies on her protected action and the close proximity of the adverse employment actions. Resp. at 19. She also points out that Defendant did not utilize a progressive discipline policy. *Id.* But Fouse explained the reason for not utilizing such a policy. *See* Fouse Dep. 49:18-50:4. The fact that Defendant did not use such a policy in the circumstances of this case is not enough to satisfy the but for requirement. Furthermore, while a "'very close' temporal proximity" may be "sufficient to establish the 'causal connection' element of her prima facie case . . . it is insufficient to demonstrate pretext." *Lyons*, 964 F.3d at 306–07. Consequently, Plaintiff has failed "to meet her burden on summary judgment to demonstrate that there is a dispute of fact whether the [employer's] stated reasons for its actions were pretextual." *Id.* at 307.

## IV. CONCLUSION

After reviewing the briefing and summary judgment evidence, Plaintiff's operative complaint, and the relevant law, the Court **GRANTS** the Motion for Summary Judgment (ECF No. 19) filed by Defendant Hill Country Mental Health & Developmental Disabilities Centers. By separate document, the Court will enter Final Judgment for Defendant.

**SIGNED this 12th day of September 2025.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**